IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PENNECO PIPELINE CORPORATION,      )
et al.,                            )
                                   )
        Plaintiffs,                )        Civil Action No. 05-49
                                   )         Doc. Nos. 81, 160, 165
              v.                   )
                                   )        Civil Action No. 05-537
DOMINION TRANSMISSION, INC., et al.,  )      Doc. Nos.  77, 98, 104
                                   )
        Defendants.                )        Chief Judge Donetta W. Ambrose
                                   )        Magistrate Judge Lisa Pupo Lenihan
                                   )

## REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

It is respectfully recommended that Plaintiffs' Motion for Partial Summary Judgment (Doc. 81 in 05-49; Doc. 77 in 05-537) be denied.  It is further recommended that the Motions for Partial Summary Judgment filed by Defendants Dominion Exploration & Production, Inc. (Doc. 160 in 05-49; Doc. 98 in 05-537), and Dominion Transmission, Inc. (Doc. 165 in 05-49; Doc. 104 in 05-537), be granted.

### II.    REPORT

This diversity action involves a dispute over leasehold interests held by Defendants under oil and gas leases executed and/or amended from 1946 through 1975.[1]  Plaintiffs seek a declaratory judgment as to the validity of the oil and gas leases with regard to oil and gas drilling and production rights.  In particular, Plaintiffs seek an order which would terminate Defendants' drilling and production rights under the leases and quiet title to their properties located in the Counties of

---

1. One lease, originally executed in 1949, was amended in 1998 on property currently owned by Robert F. Bernardi and Sarah L. Bernardi.  (Pl.'s App. Ex. 5(c) at p. 296.)

Armstrong and Indiana, Pennsylvania, in Civil Action No. 05-49, and in Westmoreland County, Pennsylvania, in Civil Action No. 05-537, thereby giving Plaintiffs the right to develop and produce the oil and gas in the subsurface formations beneath their properties. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §1332. Venue lies in this district pursuant to 28 U.S.C. § 1391(a)(2). After the close of discovery, all parties moved for partial summary judgment. For the reasons set forth below, the Court recommends that Defendants' motions for partial summary judgment be granted, and that Plaintiffs' motion for partial summary judgment be denied.

### A.  __Statement of Facts__[2]

The Plaintiffs in these two related cases are comprised of Penneco Pipeline Corporation ("Penneco"), a Pennsylvania corporation engaged in the exploration, drilling, production and marketing of oil and gas, and the landowners of certain properties situated in Armstrong, Indiana, and Westmoreland Counties, Pennsylvania (the "Landowner Plaintiffs").[3]    Defendants are

---

2.  The Court has extracted from the Concise Statements of Material Facts and responses thereto submitted by the Plaintiffs and Defendants, those facts which are essentially undisputed and material to resolving the legal issues decided by the Court in this Report and Recommendation. Thus, although a number of factual statements are disputed by the parties, summary judgment may still be granted so long as the disputed facts are not material to the resolution of the case. In addition, conclusory statements and legal conclusions contained in the parties' concise statements of material facts have been disregarded entirely and omitted.

3.  In Civil Action 05-49, the Landowner Plaintiffs are: Linette Shearer Archer and Sylvia Marlene Chase; Fred C. Pugliese; Raymond R. Rearick and Doris Rearick, his wife; William S. Roman and Beverly L. Roman, his wife; Thomas E. Weaver and Donna L. Weaver, his wife; Theodore E. Rupert and Twila M. Rupert, his wife; Jean L. Johnston and William H. Johnston, her husband; Robert E. Kelley, Jr.; Alan K. Hill and Linda V. Hill, his wife; Lisle R. Johns and Lucinda C. Johns, his wife; John L. Speer and Jean D. Speer, his wife; Andrew Kimmel and Erin Kimmel, his wife; Robert E. Deemer; Robert H. Cashdollar and Linda Lee Cashdollar, his wife; Kenneth J. Kisiel and Michelle L. Kisiel, his wife; Chris D. Kimmel and Judith M. Kimmel, his wife; Robert R. Coleman and Loretta A. Coleman, his wife; Robert A. Anderson, Jr. and Kimberly A. Anderson, his wife; Harry J. Davis; Fred Musser, Jr. t/d/b/a Musser Associates; Bradley L. Craig and Lisa Craig, his wife; Randy M. Craig and Elaine Craig, his wife; David E.

Dominion Transmission, Inc. ("DTI") and Dominion Exploration & Production, Inc. ("DEPI").[4]

DTI is an interstate natural gas storage and transportation company incorporated in Delaware with

its principal office located in West Virginia.  DTI owns and operates two storage pools in Western

Pennsylvania that are at issue here–the South Bend Storage Pool and the Oakford Storage Pool.

---

Dunmire and Betty J. Dunmire, his wife; Marie B. Cellier; James M. Pencola and Denise
Pencola, his wife; Lois J. Farster; Robert L. Anderson; Howard B. Anderson; Helen A.
Anderson, Ernest L. Anderson; William J. Anderson; Curtis Anderson; Helen L. Anderson;
Thomas P. Colosmo and Joyce A. Colosmo, his wife; Rodney D. Crawford and Patricia L.
Hemke, his wife; Mark T. Kirby and Virginia K. Kirby, his wife; Greg J. Curry; Drew L.
Kimmel and Sandra E. Kimmel, his wife; Douglas C. Craig and Carol A. Craig, his wife; Daniel
Fine and Anita Fine, his wife.  (C.A. No. 05-49, Third Am. Compl. & Order dated March 30,
2007 (Doc. Nos. 56 & 180).)

In Civil Action 05-537, the Landowner Plaintiffs are: Philip X. Masciantonio and Delores A.
Masciantonio, his wife; Masciantonio Family Limited Partnership, a Pennsylvania limited
partnership; Norma R. Bennett, Executrix of the G. Albert Earhart Estate, a decedents' estate;
David Scott Craig and Brenda Irwin Craig, his wife; John Borgo and Margaret Borgo, his wife;
Vera Loughner Jury; Richard J. Constantine and Patricia Constantine, his wife; Robert R.
Lehman and Coreen A. Lehman, his wife; Richard K. Florek and Kathryn E. Florek, his wife;
Clay F. Herrod and Catherine I. Herrod, his wife; Anthony R. Christofano, Jr.; Frank L.
Christofano; Frank L. Christofano and Anthony R. Christofano, Sr.; Timothy W. Mitchell and
Jana Mitchell, his wife; John M. Highlands, single, and Laurel Lynn Highlands, single; Robert F.
Bernardi and Sarah L. Bernardi, his wife; James R. Zitkovich and Kimberly J. Zitkovich, his
wife; Gloria M. Christofano; Anthony R. Christofano, Sr., and Gloria A. Christofano, his wife;
Frank M. Christofano and Terri Jo Christofano, his wife; James F. Mermigos and Wendy S.
Mermigos, his wife; Boyd N. Klingensmith; Wilson Saul, Executor of the Estate of Christine S.
Saul, deceased; and Thomas C. Chishko and Leanne Chishko, his wife.  (C.A. 05-537, Second
Am. Compl. & Order dated March 30, 2007 (Doc. Nos. 44 & 121).)  James and Marlene Shaw,
his wife, Lisa A. Hyde, and Willis and Marlene Shaw, his wife, were also named as Plaintiffs in
the Second Amended Complaint.  However, on March 30, 2007, pursuant to the stipulation of
the parties, the Court entered an order dismissing with prejudice all claims asserted by James
Shaw and Marlene Shaw, his wife; Lisa A. Hyde; and Willis Irwin and Marlene Irwin, his wife,
and all counterclaims asserted against them by Defendants.  (C.A. No. 05-537, Doc. No. 121.)

4.  Texas Eastern Transmission, LP was also named as a Defendant in the Second Amended
Complaint filed in Civil Action No. 05-537.  On March 30, 2007, pursuant to the stipulation of
the parties, the Court entered an order dismissing  with prejudice all claims by Plaintiffs against
Texas Eastern Transmission, LP, and all counterclaims by Texas Eastern Transmission LP
against Plaintiffs.  (C.A. No. 05-537, Doc. No. 121.)

DEPI is a natural gas exploration and production company, which is also incorporated in Delaware with its principal office located in West Virginia.  Although DEPI and DTI are affiliated companies, they are separate legal entities with separate business purposes, management, employees, and legal interests in these actions.

### 1.   Background

Oil and natural gas production was quite common in Western Pennsylvania in the early 1900s.  (Chase Decl. ¶¶ 18-19.)  Many of the leases at issue in these cases were originally executed in the early 1900s.  The leases did not provide for underground gas storage.  Indeed, at the time the leases were originally executed, gas storage pools were unnecessary as well as technically unfeasible because gas markets then were located near producing areas, resulting in short pipelines and minimal seasonal variations.

As the natural gas in the rock formations of Appalachia became depleted in the 1930s to 1940s, it became necessary to pipe gas in over long distances from the southwest, where natural gas was abundant and relatively inexpensive.  (Walden Decl. ¶¶ 7-8; Chase Decl. ¶¶ 19-22.)  Due to the heavy demands of the northeast in peak periods during the winter, however, the interstate gas pipeline system was inadequate, and the solution was to establish gas storage pools in the depleted Appalachian gas reservoirs (rock formations) and pump southwestern gas into those pools during the summer and hold it for the upcoming peak periods.  These storage pools became particularly widespread during, and immediately after, World War II.

Gas is stored in the same naturally occurring geological formations from which the gas was produced.  (Chase Decl. at ¶ 22.)  Generally, wells are used to inject gas into the storage formations. (*Id.* at ¶ 23.)  In the areas used for storage, the geological formations create a natural container which

4

allows gas to be stored there without escaping.  (*Id.* at ¶¶ 23-24.)  In addition, it is possible to explore for and produce gas from other formations above or below the storage formation.  (Neal Decl. ¶ 6.) This may be accomplished by drilling through the storage formations, but is potentially very dangerous.  If the storage container is breached, the resulting effects could cause harm not only to the supply of natural gas, but to public safety as well.   Consequently, the Commonwealth of Pennsylvania has promulgated regulations governing the drilling through storage pools.  25 Pa.Code §78.76 *et seq.*  DTI has also established standards for drilling through storage pools, which it claims are more strict that Pennsylvania's regulations.

A limited number of sites exist in the country where storage pools can be developed, and the costs of development are very expensive.  (Neal Decl. ¶ 5.)  Gas storage pools are regulated and certified by the Federal Energy Regulatory Commission ("FERC") and can only be abandoned by order of FERC.  (Walden Decl. ¶ 6.)

## 2.    The South Bend and Oakford Storage Pools

The two storage pools at issue in these cases are the South Bend and Oakford Storage Pools.  The South Bend Storage Pool is comprised of approximately 12,218 acres (including the protective zone[5]) and is located in Indiana and Armstrong Counties.  In the South Bend Storage Pool, natural gas is stored in the Hundred Foot Sand, which lies approximately 1,500 to 1,600 feet beneath the surface.  (Walden Decl. ¶ 9.)  The Federal Power Commission, FERC's predecessor, authorized the South Bend Storage Pool in 1951 and it has operated continually since the early 1950's.  (*Id.*)  Currently, DTI operates the South Bend Storage Pool.  (*Id.*)

---

5.  On the properties of the Landowner Plaintiffs, gas is stored within the storage horizon, or the properties may be used for the protection of stored gas in what is called the "protective area" or "buffer zone" of the storage operation.  (Walden Decl. ¶ 12.)

The Oakford Storage Pool is comprised of approximately 40,685 acres (including the protective zone) and is located in Westmoreland County. Natural gas is stored in both the Murrysville Sand and the Fifth Sand in the Oakford Storage Pool. (*Id.* at ¶10.) The Murrysville Sand encompasses approximately 22,598 acres (including the protective zone) and lies approximately 1,400 feet beneath the surface. (*Id.*) The Fifth Sand encompasses approximately 18,087 acres (including the protective zone) and lies approximately 2,252 feet beneath the surface. (*Id.*) The Federal Power Commission authorized the Oakford Storage Pool in 1950 and it has operated continually since the early 1950's. (*Id.*) It is jointly owned by DTI and Texas Eastern Transmission, L.P. and is operated by DTI. (*Id.*)

Prior to the establishment of the South Bend and Oakford Storage Pools, a number of producing gas wells had been drilled on the properties where both storage pools are located. From 1909 to 1948,[6] a total of 43 wells were drilled under 33 different lease agreements on the properties subject to the DTI leases. Of the 43 wells drilled, 29 were on property containing the South Ben Storage Pool and 14 of the wells were located on property containing the Oakford Storage Pool. (Pls.' Ex. 3, 4 & 5.) Some of the wells drilled were dry holes; others produced for some period of time but were then depleted. The dry holes and/or depleted wells were plugged and abandoned. When the South Bend and Oakford Storage Pools were developed, some of the plugged and abandoned wells were converted to storage/withdrawal wells. Others were converted to observation wells. Others had to be replugged so that the plug could withstand storage pressures. (Walden Decl. ¶ 11.) Of the 29 wells drilled on the properties containing the South Bend Storage Pool, six were

---

6. One well, WEPAT 890, was drilled in 1963 (Leases KL 24 and KL 26) on property owned by Fred Pugliese. (Pls.' App. Ex. 16 at pg. 5.)

plugged and abandoned,[7] and twenty-three were converted to gas storage wells and are currently being operated as such.[8] (Pls.' Ex. 3, 4 & 5.)  Of the fourteen wells drilled on properties containing the Oakford Storage Pool, four were plugged and abandoned,[9] while ten were converted to, and are still being utilized as, gas storage wells.[10] (*Id.*)  No wells were drilled under fifteen of the lease agreements, ten of which pertain to property located in the South Bend Storage Pool, and five of which pertain to property located in the Oakford Storage Pool.  (*Id.*)  None of the wells drilled between 1909 and 1948 were drilled by DTI or DEPI.

### 3.   The Lease Agreements

At various dates between 1907 and 1956, a number of natural gas and utility companies, all predecessors-in-title to DTI,[11] obtained oil and gas leases ("DTI leases") from the predecessors-in-title to the Landowner Plaintiffs.[12]  Thus, at the time the storage pools were developed in 1950,

---

7.  The six wells plugged and abandoned consist of: Well Nos. WEPAT-890; KW-45; KW-63; KW-5; KW-82; KW-71.  (Pls.' Ex. 3, 4 & 5.)

8.  The twenty-three wells currently being operated as storage wells include: Well Nos. KW-57; KW-80; KW-81; KW-23; KW-49; KW-59; KW-28; KW-37; KW-40; KW-41; KW-42; KW-29; KW-61; KW-24; KW-21; KW-62; KW-9; KW-15; KW-25; KW-3; KW-48; KW-71; KW-30; KW-58.  (Pls.' Ex. 3, 4 & 5.)

9.  The four wells plugged and abandoned consist of: Well Nos. JW-180; JW-169; JW-183; and JW-97.  (Pls.' Ex. 3, 4 & 5.)

10.  The ten wells currently being utilized as gas storage wells include: Well Nos. JW-39; JW-179; JW-2; JW-1; JW-26; JW-143; JW-182; JW-65; JW-25; and JW-36.  (Pls.' Ex. 3, 4 & 5.)

11.  The predecessors-in-title to DTI include New York State Natural Gas Corporation, The Peoples Natural Gas Company, Consolidated Gas Supply Corporation, and CNG Transmission Corporation.

12.  The lone exception to this is Mr. Fred C. Pugliese, who personally entered into the lease agreement/modification to the lease agreement with one of DTI's predecessors.  (DEPI's App. at A. 1147-51.).

production leases were already held on many of the properties located in the storage pools by DTI's direct predecessor and by unrelated individuals and corporations. From the 1940s to the 1960s, the right to store gas was added, either through modification to the existing leases, or through new leases, resulting in combined production and storage leases, or so-called "dual purpose" leases. These "dual purpose" leases lie at the center of the dispute in these two related cases.

Although the dual-purpose leases vary in language and form, they all contain the following provisions:

1. A "leasing" or "granting" clause, granting the lessee the right to drill, operate, and/or produce oil and gas, and the exclusive right to store gas on or in the lessor's property and in any sand or sands or substrata in and under said property.

2. A "habendum clause," setting the term of the lease at a fixed number of years (the "primary term"), and allowing for the extension of the primary term for so long as the lessee is either producing oil or gas, or is storing gas on the premises (the "secondary term"). (However, some of the leases do not have a primary term.)

3. A "delay rental" clause, providing for compensation to the lessor when gas is not being produced or stored.[13]

4. A "royalties" clause, which sets forth the basis for determining the fees to be paid to the lessor for a producing well; this can be a fixed fee per well annually, or a percentage (usually 1/8 percent) of all oil/gas produced.

The dispute in these two related cases centers on the language in the habendum clause. All but three of the lease agreements in question have one of the following three versions of the

_____

13. Although the lease agreements also provide that the lessee is not required to explore for or produce gas, the consideration for not exploring, drilling and/or producing oil or gas is the payment of delay rentals.

habendum clause.  The first one reads as follows:

> It is further agreed that said lease shall remain in force so long as said land is operated by the Lessee in search for or production of oil or gas or operated or used for the storage of gas by the Lessee.[14]

 The above habendum clause generally was found in those leases that were modified in the 1950s to add gas storage rights.

Another form of the habendum clause found in many of the lease agreements reads as follows:

> It is agreed that this lease shall remain in force for the term of ten (10) years from this date and as long thereafter as the above described land, or any portion thereof, or any other land pooled or unitized therewith as provided in Paragraph 4 hereof, is operated by the Lessee in the search for or production of oil or gas or as long as gas is being stored, held in storage, or withdrawn from the premises by Lessee.  It is agreed that the cessation of production from wells on the leased premises or upon other land unitized therewith, after the expiration of the original term, shall not terminate this lease whether the pooling units have been dissolved or not, if the land is used for the storage of gas prior to the plugging and abandonment of wells from which oil or gas has been produced.  It is understood that a well need not be drilled on the premises to permit the storage of gas, and it is agreed that the Lessee shall be the sole judge as to whether gas is being stored within the leased premises and that its determination shall be final and conclusive.[15]

---

14.  *See* DEPI App. at A. 1183-84 (R. & D. Rearick); A. 1281-82 (T. & D. Weaver); A. 890-91 (J. & W.  Johnston); A. 837-38 (A. & L.  Hill); A. 865-66 (L. & L. Johns); A. 1266-67 (J. & J. Speer);  A. 948-49 (A. & E. Kimmel); A. 997-98, 1003-04 (C. & J. Kimmel-two leases); A. 1100-1101 (F. Musser);  A. 1120-21 (J. & D. Pencola); A. 731-32 (G. Curry); A. 810-11 (D. & A. Fine); A. 413-14 (P. & D. Masciantonio);  A. 1-2 (N. Bennett/Earhart Estate); A. 382-84 (R. & C. Lehman); A. 496-97 (S. Saul/C. Saul Estate).

15.  *See* DEPI App. at A. 1147-61 (F. Pugliese–20 year primary term); A. 1051-55 (M. & V. Kirby);  A.  781-85, 786-89 (L. Farster, R. & Ernest, Helen, Howard, Robert, William & Curtis Anderson-two leases); A. 645-49 (T. & J. Colosmo); A. 557-560 (R. & L. Cashdollar); A. 357-61 (B. Klingensmith); A. 601-04 (R. & L.  Coleman, R. & K. Anderson, & H. Davis–20 year primary term); A. 673-77 (B. & L. Craig, R. & E. Craig).

Finally, the following habendum clause appeared in a number of other lease agreements:

> It is agreed that this lease shall remain in full force for the term of ten (10) years from [this date] [September 18, 1946], and so long thereafter as said land is operated by the Lessee in the search for or production of oil or gas or so long as gas is being stored, held in storage or withdrawn from the premises by Lessee.  It is understood that a well need not be drilled on the premises to permit the storage of gas, and it is agreed that the Lessee shall be the sole judge as to whether gas is being stored within the leased premises and that its determination shall be final and conclusive.[16]

The habendum clauses in the  remaining three leases at issue vary slightly, but each provides that the term will be extended so long as the properties are used for either the production of oil or gas or for the storage of gas.  *See* DEPI App. at A. 52-53 (T. & L. Chishko);[17] A. 199-203 (S. & B. Craig);[18] and A. 706-09 (R. Crawford & P. Hemke).[19]

---

16.  *See* DEPI App. at 534-37 (L. Archer & S. Chase); A. 1210-15 (W. & B. Roman); A. 1238-41 (T. & T. Rupert); A. 914-17 (R. Kelley, Jr.); A. 1000-02, 1005-08 (C. & J. Kimmel-2 leases); A. 756-59 (D. & B. Dunmire); A. 1074-77 (K. & M. Kisiel); A. 71-74 (Christofanos:  Anthony (Jr.), Frank M. & Terry Jo, Frank L., Gloria, Anthony (Sr.); J. & K. Zitkovich); A. 445-48 (J. & W. Mermigos); A. 469-72 (T. & J. Mitchell); A. 289-92 (J. & L. Highlands); A. 25-28 (R. & S. Bernardi); A. 333-36 (V. Jury); A. 172-75 (R. & P. Constantine); A. 232-35 (R. & K. Florek); A. 258-62 (C. & C. Herrod); A. 975-78 (A. & E. Kimmel, R. Deemer).

17.  The habendum clause in the Chishko lease states: "It is further agreed that said lease shall remain in force so long as said land is operated by the Lessee in search for or production of oil or gas or operated or used for the storage of gas by the Lessee, but in no event shall the term exceed fifty (50) years from the date of abandonment of all wells drilled and operated on the premises." DEPI App. at A. 52.

18.  The habendum clause in the S. & B. Craig lease provides: "That said lease shall remain or continue in force for the original or amended term thereof, and for a further definite term of ten years from the date hereof, and so long thereafter as said land is operated by the Lessee in search for or production of oil or gas, or as long as gas is being stored, held in storage or withdrawn from the premises by Lessee."  DEPI App. at A. 200.

19.  The habendum clause in the Crawford/Hemke lease contains the same language as in the S. & B. Craig lease (*see* note 15, *supra*), with the following additional language at the end: "It is

In addition, except for the lease agreements containing the first version of the habendum clause, all of the other lease agreements contain the following language in the delay rental clause: "It is agreed that Lessee may drill or not drill on the leased premises, as it may elect, and that the consideration and rentals paid and to be paid constitute adequate compensation for such privilege."

Moreover, all of the lease agreements contain either a separate provision for Payment for Storage Privileges or similar wording contained in either the Royalties clause or, in the case of a "Modification to Lease" agreement, in the paragraph immediately following the term of the lease. Generally, the Payment for Storage Privileges provision provides that in full compensation for the storage rights granted under the lease agreement, and in lieu of all delay rental or royalty due or to become due for the right to produce or for the production of oil or gas, lessee agrees to pay an annual storage rental.  When no wells on the leased property are utilized for storage of gas, the storage rental is usually based either on a dollar amount per acre or fixed fee.  This payment continues until the leased premises is no longer being used for storage purposes, or until wells on the leased premises are utilized for the storage of gas, in which event the lessee ceases paying the storage rental to lessor and pays, in lieu thereof, a storage well rental or royalty, usually set at a fixed quarterly rate per well.  *See, e.g.,* Lease Nos. KL-156 (B. & L. Craig, R. & E. Craig); KL-175 & KL-179 (L. Farster, Andersons); KL-165 (T. & J. Colosmo); KL-24, KL-26, KL-80 (F. Pugliese); KL-126 (R. & L. Cashdollar); KL-27 (R. & L. Coleman, R. & K. Anderson, H. Davis); KL-160 (M. & V. Kirby); JL-700 (B. Klingensmith).  Those leases which address storage rentals in the Royalties provision generally provide:

---

understood that a well need not be drilled on the premises to permit the storage of gas, and it is agreed that the Lessee shall be the sole judge as to whether gas is being stored within the leased premises and that its determination shall be final and conclusive."  DEPI App. at A. 706.

> The Lessee covenants and agrees to pay to the Lessor for each well on said premises utilized by the Lessee for the storage of gas, amounts equal to the royalties above provided, and to pay the same so long as said well shall be so utilized, it being understood that such payments shall be in lieu of and not in addition to royalties or rentals otherwise provided for by this agreement.   Should the Lessee continue to store gas within the leased land after having plugged and abandoned all wells thereon, Lessee agrees to pay in lieu of the sums payable under this paragraph, and lessor agrees to accept for the remainder of the term of this lease, the rental as hereinafter provided in paragraph 5 [delay rental].

*See, e.g.,* Lease Nos. KL-113 (T. & T. Ruppert); JL-74 (R. & P. Constantine).

Finally, the pertinent language in the Modification to Lease agreement, generally provides that until the lessee utilizes the gas wells for the storage of gas, it shall continue to pay the royalties then being paid.  Once the lessee begins using the wells for storage of gas, it must give written notice of same to the lessor and pay, in lieu of royalties, a fixed sum quarterly for each well so utilized.  This quarterly storage fee continues until the well is no longer utilized for the storage of gas, at which time the royalty payments resume and continue until the lessor gives notice to the lessor that it intends to abandoned the wells or, in fact, has plugged and abandoned the wells.  However, if lessee stores gas within the leased premises after having plugged and abandoned all wells, the lessee must pay, in lieu of all royalty or other sums paid to lessor, a fixed quarterly fee until surrender or expiration of the lease as amended.  *See, e.g.,*  Lease Nos. KL-32 (A. & L. Hill); JL-373 (Bennett/Earhart Estate).

Since the 1950s, DTI and its predecessors have continuously stored gas under the subject properties during the terms of the leases at issue here.  The Landowner Plaintiffs believe that DTI and its predecessors have paid and/or tendered the quarterly storage rentals to them as provided in the oil and gas lease agreements.  *See* Pls.' Answer to DTI's Interrogatory No. 10 (DTI App., Ex.

12).  Indeed, most of the Landowner Plaintiffs admitted having received all storage rental payments due under the oil and gas lease agreements.[20]   Nonetheless, all of the Landowner Plaintiffs who denied receiving storage rentals either were not identified as payees on the lease agreements or never filed the proper papers to have the payments transferred to them, and therefore, someone else was properly receiving the payments under the lease agreements.[21]   Moreover, when asked to clarify at oral argument whether any of the Landowner Plaintiffs were claiming that they did not receive the storage rental payments due under the lease agreements, counsel for Plaintiffs, Mr. Lambert, responded in the negative.

Finally, most of the Landowner Plaintiffs have indicated that they never (1) gave any notice to any defendant or their predecessors that the lease had terminated or expired, (2) made any demand to any defendant or their predecessors to drill on the property, and/or (3) provided any opportunity to cure to any defendant or their predecessors.[22] Landowner Plaintiffs Hill, Masciantonio,

---

20.  *See* Pls.' Responses to Requests for Admissions, RFA No. 3 (DEPI App., Vol. II - V). However, a few of the Landowner Plaintiffs denied having received any storage rentals since they owned the property in their responses to the requests for admissions.  *See* Response to RFA No. 3, DEPI App. at A. 401 (R. & C. Lehman); A. 457 (J. & W. Mermigos); A. 587 (R. & L. Cashdollar); A. 627 (R. & L. Coleman, R & K. Anderson, H. Davis); A. 694-95 (B. & L. Craig, R. & E. Craig); A. 1090 (K. & M. Kisiel); A. 1135-36 (J. & D. Pencola); A. 61 (T. & L. Chishko); A. 277 (C. & C. Herrod); A. 221 (D. & B. Craig).

21.  *See* Deposition Testimony ("Dep.") of  R. Cashdollar at 24 (DEPI App. at A. 568); Dep. of R. Coleman at 16-17 (DEPI App. at A.609-10); Dep. of R. Craig at 29-30 (DEPI App. at A. 687-88); Dep. of M. Kisiel at 81 (DEPI App. at A. 1085); Dep. of J. Pencola at 10 (DEPI App. at A.1125); Dep. of T. Chishko at 42-43 (DEPI App. at A. 56-57); Dep. of C. Herrod at 15 (DEPI App. at A. 264); Dep. of D. Craig at 24 (DEPI App. at A.212); *see also* Declaration of Shana Gould, DTI Lease Ownership Clerk (DTI App., Ex. 2).

22.  *See* Response to Interrogatory Nos. 10 (e) - (g) and 11 (e) - (g), DEPI App. at A. 16-17 (N. Bennett); A. 43-44 (R. Bernardi); A. 91-92 (A. & G. Christofano); A. 98-99 (F. Christofano); A. 105-06 (F. & A. Christofano, Sr.); A. 112-13 (A. Christofano, Jr.); A. 119-20 (G. Christofano); A. 126-27 (F. & T. Christofano); A. 133-34 (J. & K.  Zitkovich); A. 189-90 (R. & P. Constantine); A. 223-25 (D. & B. Craig); A. 249-50 (R. & K. Florek); A. 280-81 (C. & C.

Farster/Anderson, and Curry stated that they made several demands in the past as to drilling on their properties, but there does not appear to be any documentary evidence of these demands.[23]  With regard to the Oakford Storage Pool, it appears that none of the predecessors in title to the Landowner Plaintiffs owning property in that area, although having numerous contact with Robert Barger, who worked in several capacities for Consolidated Natural Gas Transmission Company at the Oakford District, including District Superintendent, during 1950 to 1954 and 1956 to 1976, ever told Mr. Barger that they considered their leases terminated or void, either wholly or partially, by any failure to drill production wells on their property.  Barger Decl. at ¶¶ 3, 4, 10 (DTI App. Ex. 1).

**4.      DTI/DEPI Production/Drilling Activities**

On June 21, 2002, DEPI and DTI entered into a "Farmout Agreement," pursuant to which DTI granted to DEPI, "insofar as DTI has the right to do so under the leases, the exclusive right to drill wells on any of the leases identified on Exhibit A to this Agreement." (Ex. 11-1, Pls.' App. 33;

---

Herrod); A. 296-97 (J. & L. Highlands); A. 348-49 (V. Jury); A. 373-74 (B. Klingensmith); A. 487-88 (T. & J. Mitchell); A. 516-17 (C. Saul); A. 630-31 (R. & L. Coleman, R. & K. Andersen, H. Davis); A. 664-65 (T. & J. Colosmo); A. 697-98 (B. & L. Craig, R. & E. Craig); A. 828-29, 829A (D. & A. Fine); A. 882-83 (L. Johns); A. 906-07 (J. & W. Johnston); A. 939-40, 940A (R. Kelley, Jr.); A. 966 (A. & E. Kimmel); A. 1036 (C. & D. Kimmel); A. 989 (A. & E. Kimmel/R. Deemer); A. 1065 (M. & V. Kirby); A. 1175 (F. Pugliese); A. 1200-01 (R. & D. Rearick); A. 1230-31, 1231A (W. & B. Roman); A. 1258-59, 1259A (T. & T. Rupert); A. 1273, 1273A (J. & J. Speer); A. 1303-04 (T. & D. Weaver); A. 591-92 (R. & L. Cashdollar); A. 547-48 (L. Archer); A. 1140 (J. & D. Pencola); A. 63, 63A (T. Chishko; Dep. at 6, 10); A. 1092 (K. & M. Kisiel); A. 1112 (F. Musser–part (g) (opportunity to cure) deemed admitted); *see also* Dep. of R. Lehman at 80 (DEPI App. at A. 398).

23.  *See* Responses to Interrogatory No. 11 (e) & (f), DEPI App. at A. 856 (A. & L. Hill (contacted lessee 3 or 4 times in last 10-15 years regarding drilling)); A. 437 (P. & D. Masciantonio (inquiry in 1994 or 1995)); A. 802-03 (Farster/Anderson (notice given on unknown date by R. Anderson to DTI's predecessor of lease termination and demanding drilling); A. 748-49 (G. Curry (contacted lessee 3 or 4 times in last 10-15 years regarding drilling)).

Neal Decl. at ¶ 13.)  In addition, DTI granted to DEPI the right to produce and market the oil and

gas.  (*Id.*)  The Farmout Agreement further provides that "[a]ll of these rights shall be subject to the

terms of the leases included in Exhibit A, as amended, modified, or extended, . . .."  (Ex. 11-1, Pls.'

App. 33.)

        Between 2002 and 2006, DEPI has drilled 25 production wells within the two storage

pools,[24] and plans to drill approximately 20 more wells in the two storage pools in 2007.  (Neal Decl.

at ¶ 10, 15.)  All 25 of the production wells drilled so far and the 20 wells planned for 2007 are

located on properties where Penneco does not have a top lease over DTI's leases.  (Neal Decl. at ¶

16.)  DEPI contends it has drilled fewer wells than it otherwise would have drilled and has not

drilled any wells on the properties at issue due to the existence of the Penneco top leases and these

lawsuits, notwithstanding DTI's belief that its leases are valid and not Penneco's.  (*Id.*)  DEPI

submits that it did not drill production wells earlier because the price of gas was not high enough

to justify the extra costs of drilling through the storage formation and to justify incurring the risk to

the storage formation, and because the technical knowledge as to the drilling and cementing

techniques which protect the storage formations are better today.  (Neal Decl. at ¶ 17.)  Plaintiffs

dispute DEPI's explanation for not drilling, claiming that other drilling companies drilled

approximately 127 production wells between 1958 and 2006.  (Pls.' Reply Br. at 29-30 (citing Smail

Aff. ¶ 4).)

        In addition, DEPI contends it has considered searching for and producing gas from both

_____

24.  In 2002, DEPI drilled five wells in the Oakford Storage Pool and one well in the South Bend
Storage Pool.  (Neal Decl. at ¶ 15.)  In 2004, DEPI drilled two more wells in the Oakford
Storage Pool.  (*Id.*)  In 2006, DEPI drilled eight wells in the Oakford Storage Pool and nine wells
in the South Bend Storage Pool.  (*Id.*)

storage pools since 1999.  (Neal Decl. at ¶ 10.)  In this regard, DEPI produced a geological report

from geologist William Hayward, which was commissioned by its predecessor, CNG Producing

Company in February 1999, as to the South Bend Storage Pool, and identified potential drilling

locations.  *See, Geological Analysis of the Upper Devonian Bradford Group Formations, CNG

Transmission's South Bend Storage Pool,* attached to Neal Decl.  (DEPI App.–Vol. I.)

Plaintiffs dispute that DTI and/or DEPI have undertaken any actions to drill on the

Landowner Plaintiffs' properties from 1990 to 2006, citing in support the testimony of Russell

Johnson, the manager of the Land and Right of Way Department, for CNG Transmission

Corporation and its successor-in-interest, DTI.[25]  *See* Deposition of Russell Johnson ("Johnson

Dep.") at 12, 37, 40-42 (Pls.' Ex. 13).[26]  An examination of Mr. Johnson's testimony does not,

however, bear out Plaintiffs' assertion, and therefore, such assertion does not create an issue of

fact.[27]  In disputing Defendants' claim of drilling, Plaintiffs also refer to the minutes from the

---

25.  Apparently, Mr. Johnson was employed by CNG Development Company prior to commencing employment with CNG Transmission Corporation in 1990.  Deposition of Russell Johnson ("Johnson Dep.") at 39-40 (Pls.' Ex. 13-39 to13-40).  CNG Development Company merged into CNG Producing Company in 1990, and CNG Producing Company eventually became DEPI.  *Id.* at 43 (Pls.' Ex. 13-43).

26.  Preliminarily, the Court notes that Mr. Johnson's testimony was given on behalf of DTI, as its Rule 30(b)(6) corporate designee, and not on behalf of DEPI.

27.  Mr. Johnson testified that prior to 2000, the CNG companies, specifically CNG Development Company and Consolidated Gas Supply Corporation, were involved in the drilling of production wells in Pennsylvania.  Johnson Dep. at 37-38 (Pls.' Ex. 13).  Mr. Johnson testified that as to CNG Development Company, it drilled oil and gas productions wells in Pennsylvania in the 1980s, but not in the 1990s because it merged into CNG Producing Company in 1990; he did not know the specific time period during which Consolidated Gas Supply Corporation conducted its drilling operations.  *Id.* at 38-39 (Pls.' Ex. 13).  Also, while he was working for CNG Development Company, Mr. Johnson testified that this company prepared an annual drilling program/plan, and he was involved in the implementation of that plan.  *Id.* at 42 (Pls.' Ex. 13).  Mr. Johnson further testified that he has no knowledge of whether CNG Producing Company (DEPI"s predecessor) drilled any oil or gas wells in Pennsylvania after

meetings of the Committee on Development and Operations ("Committee")[28] dating from 1951 to present.[29] These minutes do not prove that drilling did not occur; rather, the minutes indicate merely that drilling was not discussed, except for two occasions.  Nor does Plaintiffs' allegation, that in response to their discovery requests, the "Dominion companies" did not produce any documents or written communications demonstrating an intent to drill oil and gas production wells on the properties in question except for the "Farmout Agreement" between DTI and DEPI, raise a question of fact.  Rather, this appears to be nothing more than a red herring.[30]  In any event, whether or not

_____

1990 because he left CNG Development Company in 1990.  *Id.* at 39 (Pls.' Ex. 13-39). With regard specifically to CNG Transmission Corporation and DTI, Mr. Johnson testified he had no recollection of whether either of those companies drilled oil or gas production wells in Pennsylvania between 1990 and 2006.  *Id.* at 41-42 (Pls.' Ex. 13-41 to 13-42).  Thus, Mr. Johnson's testimony establishes only that DEPI and its predecessors drilled production wells *in Pennsylvania* between 1980 and 1990, and that CNG Development Company had an annual drilling program/plan.

28.  The Committee on Development and Operations was created pursuant to the Oakford Storage Agreement between DTI's predecessor, New York State Natural Gas Corporation, and Texas Eastern Transmission Corporation.  (Pls.' Ex. 9 & 10.)

29.  According to Plaintiffs, the Committee met on at least 97 occasions and the minutes from those meetings do not reflect any announcement or discussion by the "Dominion Companies" of an intent to drill oil or gas production wells on any of the properties at issue, except for two notations regarding drilling, which Plaintiffs submit do not appear to have been acted upon.  DTI counters that just because the minutes may not indicate that drilling was discussed, that does not mean that it was neither discussed nor considered at a particular meeting.  DTI further submits that Plaintiffs' assumption that no drilling occurred is unfounded as nothing in the minutes supports that assumption.  Rather, DTI states that the meeting minutes show that the Committee was focused on storage in the Oakford Storage Pool.  (DTI's Resp. to Pls.' Consol. Concise Stmt. of Material Facts, ¶ 50.)

30.  Plaintiffs attempt to glean admissions from DTI's and DEPI's responses to Plaintiffs' written discovery.  DTI and DEPI counter that Plaintiffs' requests for production of documents were limited, resulting in no or little responsive documents.  DEPI further states it made proper objection to Plaintiffs' Interrogatory No. 4, which Plaintiffs never followed up or made a revised requests.  This appears to be much ado about nothing.  The documents that do exist appear to be made part of the appendices to these summary judgment motions.

DTI and/or DEPI drilled or intended to drill on the properties in question is not material to the outcome of this case, for the reasons set forth below.

     **5.**     **Penneco Leases**

     The Landowner Plaintiffs contend that the DTI combined production and storage leases terminated at the end of the primary terms due to the failure of DTI and/or DEPI to produce gas during the primary term.  (Civ.A. No. 05-49, Third Am. Compl.  ¶¶ 344-357; Civ. A. 05-537, Second Am. Compl. ¶¶ 283-296.)  Consequently, they entered into lease agreements with Penneco ("Penneco leases" or "top leases") between 1995 and 2005, which purport to give Penneco the right to drill and operate for and produce oil and gas on the same properties that are subject to the DTI leases.  (Dep. of Terrence Jacobs ("Jacobs Dep.") at 48; Pls.' App., Ex. 3-1 to 3-55; Lease Chart attached to Declaration of Nicole R. Snyder Bagnell ("Bagnell Lease Chart"), DEPI App.)  The primary term under the Penneco leases varies slightly, lasting from three to ten years.[31]  *See, e.g.,* DEPI App. at A. 595-600 (R. & L. Cashdollar); A. 440-44 (P. & D. Masciantonio); *see also* Pls.' Ex. 4(b) and 5(b).  The Penneco leases also contemplate a secondary term that lasts "as long as thereafter as the above described  land is operated by the Lessee in the search for or production of oil and gas."  *Id.*  Many of the Penneco leases specifically provide that the term does not begin to run, however, until the final adjudication or resolution of any litigation commenced by lessee to

---

31.  Some of the Penneco leases provide for an extension of the primary term for an additional seven years where an initial well is drilled but yields no royalty to the lessor, conditioned upon the lessee continuing to hold a radius of 1,500 feet from the wellbore of said well, and the continuing payment of the delay rental provided for in the lease.  *See, e.g.,* DEPI App. at A. 599 (Cashdollar).

determine title.[32]   *See, e.g.,* DEPI App. at A. 442 (Masciantonio).   In addition, the Penneco leases, like many of the DTI leases, provide that the lessee "may drill or not drill on the leased premises, as it may elect, and that the consideration and rentals paid and to be paid constitute adequate compensation for such privilege." *See, e.g.,* DEPI App. at A. 595-600 (R. & L. Cashdollar); A. 440-44 (P. & D. Masciantonio); *see also* Pls.' Ex. 4(b) and 5(b).  The Penneco leases are all subsequent in time to the issuance and recording of the DTI leases.   (Jacobs Dep. at 48; Pls.' Ex. 4(b) & 5(b); Bagnell Lease Chart.)

Since entering into the leases with the Landowner Plaintiffs, Penneco began drilling wells in 2005, and has drilled only seven wells to date, all in the area of the South Bend Storage Pool. (Jacobs Dep. at 69-70, 72.)   In addition, it appears that three of the seven wells were "not so hot." (Jacobs Dep. at 76.)

### 6.        Procedural History

Penneco and the Landowner Plaintiffs instituted Civil Action 05-49 on January 14, 2005, which involves the landowners whose properties lie in the South Bend Storage Pool.  On April 25, 2005, Penneco and the Landowner Plaintiffs instituted Civil Action 05-537, which involves the landowners whose properties lie in the Oakford Storage Pool. After the completion of non-damages discovery, on February 13, 2007, Plaintiffs in both cases moved for partial summary judgment. DEPI and DTI responded and filed their own motions  for partial summary judgment on March 16, 2007 on all of the properties in these two actions except for the properties owned by Landowner

---

32.  The Penneco leases executed in 2005 contemplate the instant litigation; however, the earlier Penneco leases specifically reference the litigation between Penneco Energy Corporation and CNG Transmission Corporation in this District filed at Civil Action No. 96-319 (Judge Cercone), which was resolved in 2004.  *See, e.g.,* DEPI App. at A. 599 (Cashdollar).

Plaintiffs John and Margaret Borgo, Drew and Sandra Kimmel, Douglas and Carol Craig, and Marie

Cellier.[33]   Upon stipulation of the parties, on March 30, 2007, the Court dismissed with prejudice

all claims by Plaintiffs asserting that the rights of Defendants to operate or store oil and gas within

the properties of the Landowner Plaintiffs have terminated or have been abandoned, in whole or in

part.  The Court also dismissed with prejudice all claims against and counterclaims by Texas Eastern

Transmission, L.P., and dismissed the claims of Landowner Plaintiffs James and Marlene Shaw, Lisa

A. Hyde, and Willis and Marlene Irwin, and all counterclaims brought against them.

In their motion for partial summary judgment, Plaintiffs seek a declaration that the oil and

gas production rights in all of the DTI leases have terminated.  Where Defendants drilled oil and gas

production wells on the Landowner Plaintiffs' properties during the primary term of the leases,

Plaintiffs contend that Defendants' production rights expired automatically at such time as

Defendants ceased to produce oil or gas from said production wells, even though Defendants were

exercising their gas storage rights under the leases.  In instances where Defendants did not drill any

oil or gas production wells on said properties, Plaintiffs contend that Defendants' production rights

expired upon the expiration of the primary term of the DTI leases.  According to Plaintiffs, although

payment of delay rentals during the primary term was sufficient for Defendants to retain their

production rights, after the expiration of the primary term, Defendants could retain their production

---

33.  DEPI expressly states in its Memorandum of Law in Support of its Motion for Partial
Summary Judgment ("DEPI Mem. of Law") that it is not moving for summary judgment on the
properties owned by John Borgo and Margaret Borgo, Drew and Sandra Kimmel, Douglas and
Carol Craig, and Marie Cellier, as it does not hold leases on the properties owned by these
Landowner Plaintiffs.  (DEPI Mem. of Law at p. 4 n.3.)  DTI concedes as much by its adoption
and incorporation of DEPI's Motion for Partial Summary Judgment and supporting
memorandum.  (DTI's Mem. of Law in Support of Mot. for Partial Summ. J. and in Opp'n to
Pls.' Mot. for Partial Summ. J. ("DTI Mem. of Law") at 4 n.1.)

rights only if the properties were operated in the search for or production of oil or gas.[34]  In the event the Court finds that Defendants' production rights have not been terminated, Plaintiffs argue that Defendants had an implied covenant to develop and produce oil and gas from the properties at issue, and having failed to do so, Defendants should be deemed to have forfeited and/or abandoned their oil and gas production rights.  In support of their argument, Plaintiffs rely almost exclusively on the decision of Judge Cercone in *Jacobs v. CNG Transmission Corp.*, 332 F.Supp.2d 759 (W.D.Pa. 2004) ("federal *Jacobs*"), which Plaintiffs claim involved identical issues of law and virtually identical factual issues.[35]  Finally, Plaintiffs contend that the doctrine of issue preclusion precludes relitigation of the issue of whether Defendants' forfeited their production rights under the DTI leases, as that issue was already decided by Judge Cercone in *Jacobs*.

On the other hand, Defendants argue that Judge Cercone's decision in *Jacobs* was decided incorrectly as to whether an implied covenant to develop and produce oil and gas existed in that case.  Defendants maintain that Judge Cercone's determination that an implied covenant to develop and produce oil and gas existed cannot be reconciled with his finding that the drilling and production rights under the lease were not severable from the storage rights.  Defendants further argue that while Judge Cercone correctly identified the applicable legal standard, he did not apply it correctly to the facts in his case.  Defendants contend that applying the Pennsylvania Supreme Court's

---

34.  This argument does not take into account those 17 leases that do not contain a primary term. *See, e.g.,* R. & D. Rearick Lease, DEPI App. at A. 1183-84.  (For a complete list, *see* discussion, *supra,* at 9.)

35.  Essentially, in *Jacobs*, Judge Cercone determined that based on the specific facts in that case, CNG Transmission owed the landowners an implied covenant to develop and produce oil and gas on their property, and by failing to do so during the primary term of the lease, breached that covenant and forfeited and/or abandoned its drilling and production rights under the lease to the subsurface except for the strata/horizons being used for gas storage.

21

decision in *Jacobs v. CNG Transmission Corp.,* 772 Pa. 445 (Pa. 2001) ("state *Jacobs*"),  to the facts

and leases at issue here,  results in a determination that an implied covenant to develop and produce

oil and gas does not exist.  In addition, Defendants argue that issue preclusion does not apply here

because these cases are not virtually identical to federal *Jacobs*; rather, differences exist in the

parties and leases, as well as in the facts involving abandonment, notice and an opportunity to cure,

existence of drilling equipment on the land, and whether wells had been drilled on the property.

Finally, Defendants submit that if the Court finds Defendants did have an implied  covenant to

develop and produce oil and gas in this case, Plaintiffs' motion for partial summary judgment should

nonetheless be denied and/or their claims barred, because material issues of fact exist as to whether

Defendants breached an implied covenant to develop and produce oil and gas, and based on the

doctrine of laches, Plaintiffs' failure to provide notice and an opportunity to cure, and/or the

application of the statute of limitations.

On April 25, 2007, oral argument was held on the motions for partial summary judgment.

As the cross motions for summary judgment have been fully briefed and argued, they  are now ripe

for determination.

### B.    Summary Judgment Standard

"When confronted with cross-motions for summary judgment '[t]he court must rule on each

party's motion on an individual and separate basis, determining, for each side, whether a judgment

may be entered in accordance with the *Rule 56* standard.'" *Schlegel v. Life Ins. Co. of N. Am.*, 269

F.Supp. 2d 612, 615 n.1 (E.D. Pa. 2003) (quoting 10A Charles A. Wright, Arthur R. Miller & Mary

Kay Kane, *Federal Practice & Procedure § 2720*  (1998)).   Thus, with respect to each party,

summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the

22

pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

More specifically, the moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis added by *Matsushita* Court).  An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**C.    <u>Analysis</u>**

Resolution of the pending cross motions for summary judgment turns upon the proper interpretation of the DTI leases.  In Pennsylvania, oil and gas leases are interpreted by applying contract principles.[36] *Hutchison v. Sunbeam Coal Corp.,* 519 A.2d 385, 389-90 (Pa. 1986) (citation omitted); *J.K. Willison v. Consol. Coal Co.,* 637 A.2d 979, 982 (Pa. 1994) (citation omitted); *Aye*

---

36.   A federal court exercising diversity jurisdiction is required to apply the substantive law of the forum state. *Covington v. Continental Tire, Inc.,* 381 F.3d 216, 218 (3d Cir. 2004); *Highlands Ins. Co. v. Hobbs Group, LLC,* 373 F.3d 347, 351 (3d Cir. 2004) (citing *Erie R.R. v. Tompkins,* 304 U.S. 64, 78 (1938)).  Thus, Pennsylvania law governs the legal issues presented here.

*v. Philadelphia Co.,* 44 A. 555, 556 (Pa. 1899).  Pennsylvania law regarding the interpretation of

contracts is well established:

> Determining the intention of the parties is a paramount consideration in the interpretation of any contract. *Robert F. Felte, Inc. v. White*, 451 Pa. 137, 143, 302 A.2d 347, 351 (1973); *Unit Vending Corp. v. Lacas*, 410 Pa. 614, 617, 190 A.2d 298, 300 (1963). The intent of the parties is to be ascertained from the document itself when the terms are clear and unambiguous. *Steuart v. McChesney*, 498 Pa. 45, 48-49, 444 A.2d 659, 661 (1982); *In re Estate of Breyer*, 475 Pa. 108, 115, 379 A.2d 1305, 1309 (1977). However, as this Court stated in *Herr Estate*, 400 Pa. 90, 161 A.2d 32 (1960), "where an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances." *Id.* at 94, 161 A.2d at 34.

> A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. *Metzger v. Clifford Realty Corp.*, 327 Pa.Super. 377, 386, 476 A.2d 1, 5 (1984); *Commonwealth State Highway & Bridge Auth. v. E.J. Albrecht Co.*, 59 Pa.Commw. 246, 251, 430 A.2d 328, 330 (1981). *See also* Black's Law Dictionary 73 (Rev. 5th ed. 1979). The court, as a matter of law, determines the existence of an ambiguity and interprets the contract whereas the resolution of conflicting parol evidence relevant to what the parties intended by the ambiguous provision is for the trier of fact. *Easton v. Washington County Ins. Co.*, 391 Pa. 28, 137 A.2d 332 (1957); *Fischer & Porter Co. v. Porter*, 364 Pa. 495, 72 A.2d 98 (1950). *See* generally 4 Williston on Contracts § 616 (3d ed. 1961).

*Hutchison,* 519 A.2d at 389-90; *see also Murphy v. Duquesne Univ. of the Holy Ghost,* 777 A.2d

418, 429-30 (Pa. 2001) (citing *Hutchison, supra*; other citations omitted).  As further explained by

the Pennsylvania Supreme Court in *Willison,* applying well- established Pennsylvania contract law

to the oil and gas lease in that case:

> The accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given the agreement. [*Amoco Oil Co. v. Snyder,* 478 A.2d 795, 798 (Pa. 1984)].  "It is well established that the intent

24

> of the parties to a written contract is to be regarded as being
> embodied in the writing itself, and when the words are clear an
> unambiguous the intent is to be discovered only from the express
> language of the agreement." [*Steuart v. McChesney,* 444 A.2d 659,
> 661 (Pa. 1982).]

*Willison,* 637 A.2d at 982.  Thus, the question of whether the DTI leases are ambiguous is a legal

one for the Court to decide.  *Hutchison*, 519 A.2d at 390.

### 1.      Examination of Language of DTI Leases

Applying the above legal precedent, this Court must first examine the language of the DTI

leases and determine whether the meaning is plain and unambiguous.  Each of the leases at issue

grants two rights to the lessee:  the right to drill, operate, and/or produce oil and gas ("production

rights"), *and* the exclusive right to store *any kind of gas* on or in the lessor's property or sand or

sands or substrata of that property ("storage rights").  (Emphasis added.)   By the use of the words,

"any kind of gas," it is clear that the storage of gas is not limited to gas obtained from the leased

premises or any land pooled or unitized  with the leased premises.  Moreover, this provision does

not limit the storage to particular formations, strata, or horizons.

The dual-purpose of the DTI leases is consistent with the habendum clause in each of those

leases, which provides, in essence,  that the lease term can be extended indefinitely so long as the

land is being operated by the lessee in the search for or production of oil or gas *or* used for the

storage of gas.[37]   The use of the disjunctive conjunction "or" in the habendum clause clearly

---

37.  The lone exception is the Chishko lease, which caps the term of the lease at 50 years from
the date of abandonment of all wells drilled and operated on the premises.  (DEPI App. at A. 52.)
Well No. 36 was drilled in 1948 on the property now owned by the Chishkos; that well was
converted to a storage well in 1950 and is currently being used as a storage well.  As the well has
not yet been abandoned, the term of Lease No. JL-380 has not expired.

indicates that the term of the lease can be extended by the occurrence of *either* event: the production of gas *or* the storage of gas on the property subject to the lease. Moreover, other than the actual storage of gas prior to the expiration of the primary term of the lease (if the lease includes a primary term), no other condition exists as to gas storage in order for the lease term to be extended.

The continuation of the lease term upon the mere storage of gas is consistent with other language in the habendum clause. For example, eleven of the DTI leases also provide, in the habendum clause, that "the cessation of production from wells on the leased premises or upon other land unitized therewith, after the expiration of the original term, shall not terminate th[e] lease whether the pooling units have been dissolved or not, *if the land is used for the storage of gas* prior to the plugging and abandonment of wells from which oil or gas has been produced."[38] (Emphasis added.) These leases, as well as 19 other leases, also contain the following language: "It is understood that a well need not be drilled on the premises to permit the storage of gas, and it is agreed that the Lessee shall be the sole judge as to whether gas is being stored within the leased premises and that its determination shall be final and conclusive."[39]

Further evidence that the leases contemplated the continued duration of the lease upon mere storage of gas is the provision for payment for storage privileges. All of the leases contain a

38. *See* Pugliese (Lease Nos. KL-24, KL-26, KL-80); Kirby (Lease No. 160); Farster/Anderson (Lease Nos. KL-175 & KL-179); Colosmo (Lease No. KL-165); Cashdollar (KL-126); Klingensmith (Lease No. JL-700); Coleman/Anderson/Davis (KL-27); B. & L. Craig/R. & E. Craig (KL-156).

39. *See* L. Archer/S. Chase (KL-79); Roman (KL-89); Rupert (KL-113); Kelley (KL-56); C. & J. Kimmel (Lease Nos. KL-33 & KL-60); Dunmire (Lease No. KL-54); Kisiel (Lease No. KL-124); Christofano/Zitkovich (Lease No. JL-109); Mermigos (Lease No. JL-124); Mitchell (Lease No. JL-659); Highlands (Lease No. JL-617); Bernardi (Lease No. JL-108); Jury (Lease No. JL-73); Constantine (Lease No. JL-74); Florek (Lease No. JL-129); Herrod (Lease No. JL-92); Kimmel/Deemer (Lease No. KL-9); Crawford/Hemke (Lease No. KL-153).

provision for payment of storage privileges, usually referred to as "storage rentals," in one of the three versions set forth in Section II.A.3. above. Each version of the storage rentals provision requires, in essence, that if the lessee utilized wells on the leased premises for storage of gas, then *in lieu of all royalties or rentals otherwise due under the lease agreement*, the lessee must pay a well storage fee, so long as the lessee uses the well for storage of gas. However, if the lessee continues to store gas within the leased premises after all wells are plugged and abandoned, the lessee must pay a storage rental fee[40] *in lieu of all royalty or other sums owed under the lease agreement.* The fact that the storage rental fee or well storage fee is paid *in lieu of* royalties, delay rentals or other sums due under the lease agreements, *and not in addition thereto,* further illustrates the intent of the lessors and lessees that the lessee need not be engaged in both production and storage activities in order to extend the lease term.

Looking at the leases in their entirety, their clear and unambiguous language indicates that the lessors (Landowner Plaintiffs' predecessors in title) and lessees (DTI's predecessors) intended that the term of the leases would continue indefinitely as long as the lessees stored gas on the leased premises, despite the absence of any ongoing production/drilling activities. Any other construction of the leases in question is strained and ignores the plain language of the leases. Because the terms of the lease agreements are clear and unambiguous, there is no need to resort to parole evidence to glean the intent of the parties.

Therefore, the Court must enforce the leases as written. Accordingly, the Court finds that the DTI leases remain in effect because DTI has continuously stored gas on and in the leased

---

40. In one version of the payment for storage privileges provision, the lease states that the amount due for storage rental shall be equal to the amount due under the delay rentals clause. *See* discussion, *supra,* at 12 (leases addressing storage rentals in the Royalties provision).

premises and has paid all fees due under the lease agreements  for such storage rights.

## 2.      Severability

The Plaintiffs do not dispute that the leases remain in effect as to DTI's storage rights. Rather, Plaintiffs submit that the leases have expired with regard to DTI/DEPI's production rights. In order to reach this conclusion, the production and storage rights must be severable; yet Plaintiffs concede, and both Judges Smith and Cercone found in federal *Jacobs* with regard to a similar lease, that the parties did not intend that the production and storage rights be severable.

In the federal *Jacobs* case,[41] the United States Court of Appeals for the Third Circuit certified two questions of law to the Pennsylvania Supreme Court, one involving the severability of a contract, and the other involving the imposition of an implied covenant to develop and produce oil or gas.  In state *Jacobs*, the Pennsylvania Supreme Court answered the first question regarding severability as follows:

> [T]his Court holds that absent express language that a contract is entire, a court may look to the contract as a whole, including the character of the consideration, to determine the intent of the parties as to severability and may also consider the circumstances surrounding the execution of the contract, the conduct of the parties, and any other factor pertinent to ascertaining the parties' intent.

772 A.2d at 452.  In reaching this conclusion, the Pennsylvania Supreme Court specifically rejected the premise that a finding of ambiguity is a prerequisite to employing the doctrine of severability.

---

41.  Judge D. Brooks Smith authored the opinion and entered judgment in favor of CNG Transmission from which plaintiffs appealed to the Third Circuit.  *See Jacobs v. CNG Transmission Corp.,* Civ.A. No. 96-319, slip. op. (W.D.Pa. Sept. 22, 1997) ("J. Smith slip. op."). After the appeal, on remand, the case was subsequently reassigned to Judge Cercone due to Judge Smith's elevation to the Third Circuit.

*Id.* The Pennsylvania Supreme Court did not decide whether the lease in *Jacobs* was severable, but instead left that determination for the district court.

Applying that standard to the facts of the case in federal *Jacobs,* on remand Judge Cercone determined that the oil and gas lease was not severable.  332 F.Supp.2d at 782-83.  The lease in *Jacobs* did not contain an express provision indicating whether the agreement was to be construed as entire or several.[42]  Thus, Judge Cercone proceeded to apply the severability standard set forth above in state *Jacobs* and concluded that "(1) the contract as a whole, (2) the division of consideration and (3) the circumstances surrounding the execution of the lease indicate the parties intended [the lease] to be entire."  *Id.* at 777.  Judge Cercone found that the leasing clause as well as the habendum clause indicated that the "parties recognized that production and storage were interrelated components of developing the leasehold.  Thus the leasing clause and the habendum clause do not address separate and distinct contractual undertakings, but rather identify a single undertaking (i.e., the operation of the property) that may ripen into either or both specified

---

42.  The lease in federal *Jacobs*  was a dual purpose, production and storage lease, which had a primary term of ten years, which could be extended indefinitely by either the production or storage of gas.  332 F.Supp. 2d at 765.  The lease further provided that "cessation of production from wells on the leased premises or upon other land unitized therewith, after the expiration of the original term, shall not terminate this lease . . . if the land is used for the storage of gas prior to the plugging and abandonment of wells from which oil or gas has been produced.  It is understood that a well need not be drilled on the premises to permit the storage of gas . . .."  J. Smith slip op. at 2.  Consideration for the rights granted in the lease  took several forms: (1) royalties from producing wells, (2) free gas (up to 200,000 cubic feet per year), (3) delay rental when no wells yielding royalties have been drilled and no payments for storage of gas are due and payable, and (4) payment for storage privileges (storage rentals if gas is stored in the land without well, or storage well rentals when gas is stored in wells),  in lieu of all delay rentals or royalty due or to become due for the right to produce or for the production of oil or gas.  332 F.Supp.2d at 766-767.   Under the delay rental provision, the lease provides that the lessee can elect to drill or not drill on the property; the initial dollar compensation paid and the delay rental constitute adequate compensation for such privilege.  *Id.* at 767.

purposes." *Id.* at 778.

Judge Cercone further found that the division of the lessee's duties of payment did not support a construction of the lease as severable.   Rather, Judge Cercone found that the interrelationship between the lessee's obligation to pay delay rentals, royalties, and storage rentals, and the dual purposes of the lease were further evidence of the parties' intent to enter into an agreement with the single objective of operating the premises in a manner designed to achieve the fullest development of both production and storage rights.  *Id.*  Judge Cercone further opined:

> The provisions of consideration under the lease are not distinctly allocated to the dual purposes identified in the leasing clause, but instead are drafted in such a manner that payment for one purpose interrelates to and impacts on the payment for the other.  It follows that consideration of the lease as a whole and the provisions providing for consideration evidence an intent to enter an entire contract to develop the property for the mutual benefit of both parties to the extent it was commercially feasible to do so.  This construction is in accord with the settled case law and the prevalent views in the industry at the time the lease was executed.  Consequently, from a purely contractual point of view the lease is entire, not severable.

*Id.* at 783.

Prior to the Pennsylvania Supreme Court's decision in *Jacobs*,  Judge Smith in federal *Jacobs* also concluded that the production and storage rights in the oil and gas lease were not severable.  J. Smith slip. op. at 13.  Specifically, Judge Smith found that the oil and gas production and storage rights were "intermingled throughout the lease," in the provisions regarding the lease term and  consideration to be paid for storage and delay rental.  *Id.* at 12.  Judge Smith held:

> It is clear from the language of the lease that the lessee is not obligated to both produce and store.  Rather, the lessee has the option to exercise its rights to produce and store either together, alone, or not at all, and the consideration to be paid will depend upon the

> lessee's choice.  Hence, the consideration is not strictly apportioned
> to production and storage.  Without an apportionment of the
> consideration to be paid, the lease cannot be deemed to be severable.
> *Lucesco Oil* [*Co. v. Brewer*], 66 Pa. [351,] 354-55 [(1870)]; *Heilwood
> Fuel Co.,* [*Inc. v. Manor Real Estate Co.,*] 175 A.2d [880,] 884 [(Pa.
> 1961)].  The lease is, therefore, indivisible and its terms are binding
> with regard to both the right to produce and the right to store.

*Id.* at 12-13.

Applying the severability standard enunciated by the Pennsylvania Supreme Court in *Jacobs* to this case, the Court likewise finds that the production and storage rights are not severable.  The DTI leases here, like the lease agreement in federal *Jacobs*, are all dual-purpose leases, and contain habendum clauses that extend the term of the leases indefinitely so long as the land is used to produce or store gas.  Like the *Jacobs* lease, the compensation provisions under the DTI leases, *i.e.,* delay rentals, royalties, and storage rentals, are not distinctly allocated to production or storage rights, but rather, are written in such a way that payment for one purpose interrelates and impacts on the payment for the other.  While not all of the DTI leases contain the language in the habendum clause regarding cessation of production which was included in the *Jacobs* lease,[43] the Court finds the absence of that provision in some of the DTI leases does not alter the outcome.  The "cessation of production" language was but one indicia of the interrelationship of the production and storage rights.  The DTI leases contain other indicia of this interrelationship which are sufficient to support a finding that the lessors and lessees intended the leases to be entire, not severable.  In addition,

---

43.  The "cessation of production" language is set forth in the second version of the habendum clause found on page 9-10 of this Report and Recommendation.

several of the leases actually contain an express provision stating that the contract is entire.[44]  Thus, for these reasons and the reasons set forth by Judge Cercone and Judge Smith in *Jacobs,* the Court finds that the gas production and storage rights under the DTI leases are not severable.

Because the gas production and storage rights are not severable, and because Defendants have continuously utilized the subject properties for gas storage and paid storage rentals, the Court concludes that the DTI leases remain in force and effect as to both production and storage rights.

### 3.    Implied Covenant to Produce Oil or Gas

Plaintiffs contend that even if the Court finds Defendants' production rights did not expire under the DTI leases, pursuant to Pennsylvania law, an implied covenant to develop and produce oil and gas exists under the facts here, because the DTI leases are silent as to whether oil and gas must ever be produced when the lessee continues to store gas.  Because Defendants failed to exercise their production rights for over 40 years, Plaintiffs submit that such failure amounts to a forfeiture and/or abandonment of those rights.  Based on *Rook v. James E. Russell Petroleum, Inc.,* 679 P.2d 158 (Kan. 1984), Plaintiffs argue that this Court should declare that Defendants have forfeited their oil and gas production rights under the DTI leases for failure to proceed with exploration, development and/or production of oil or gas on the properties in question.

Defendants counter that the DTI leases do address the question presented here, *i.e.,* whether oil and gas must ever be produced where the lessee is storing gas.  Defendants submit that the DTI leases expressly provide that the Landowner Plaintiffs shall be compensated if the lessee does not

---

44.  DEPI App. at A. 1150, 1155, 1160 (Pugliese–3 leases); A. 559 (Cashdollar); A. 603 (Coleman/Anderson/Davis); A. 1054 (Kirby); A. 360 (Klingensmith); A. 784, 789 (Farster/Anderson–2 leases); A. 648 (Colosmo); Pls.' Ex. 4-491 (B. & L. Craig/R. & E. Craig).

actively explore, develop, and/or produce oil and gas, and therefore, they have no implied obligation to engage in production activities.  Defendants further argue that *Rook* is not binding here and, in any event, is distinguishable on its facts.

The Court agrees with Defendants and finds that under the facts here the application of an implied covenant to develop and produce is foreclosed.  The Pennsylvania Supreme Court's holding in *Jacobs* controls the outcome in this case.  In *Jacobs,* the Pennsylvania Supreme Court addressed the following certified question from the Third Circuit: "whether Pennsylvania jurisprudence recognizes an implied covenant to develop and produce oil or natural gas that would impose upon a lessee the obligation to produce oil and gas from property leased for that purpose." *Jacobs,* 772 A.2d at 452.  After reviewing its prior decisions on the issue of an implied covenant to develop and produce oil or natural gas, the Pennsylvania Supreme Court opined in response to the Third Circuit:

> An implied covenant to develop the underground resources appropriately exists where the only compensation to the landowner contemplated in the lease is royalty payments resulting from the extraction of that underground resource.  Where, however, the parties have expressly agreed that the landowner shall be compensated if the lessee does not actively extract the resource, then the lessee has no implied obligation to engage in extraction activities.  Thus, so long as the lessee continues to pay the landowner for the opportunity to develop and produce oil or gas, the lessee need not actually drill wells.  At the point where that compensation ceases due to the expiration of the term of the lease, or pursuant [to] the terms of the lease itself, the lessee then has an affirmative obligation either to develop and produce the oil or gas or terminate the landowner's contractual obligations.  As this Court stated in *McKnight v. Manufacturers' Natural Gas Co.,* 146 Pa. 185, 204, 23 A. 164, 166 (1892): "The defendant cannot hold the premises and refuse to operate them."

*Id.* at 455 (footnote omitted).  The Pennsylvania Supreme Court declined to offer any opinion as to whether the parties' agreement under the lease in *Jacobs* foreclosed an implied covenant to

reasonably develop and produce oil or gas, leaving that to the Third Circuit (and ultimately Judge Cercone) to decide.  *Id.*

In the case at bar, it is clear from the language of the DTI leases that royalty payments for the extraction of oil and gas were not the only compensation contemplated by the parties.[45]  Under the DTI leases, the parties expressly agreed that delay rentals would be paid until a well yielding royalties was drilled on the leased premises or until storage rentals became due and payable, and that the consideration and rentals paid and to be paid constituted adequate consideration for the right to drill or not drill.  In addition, the parties also agreed that storage rental fees or well storage fees are to be made in lieu of and not in addition to royalties, delay rentals, or other sums otherwise due under the leases, when lessees stored gas in the properties or in the production wells on the properties.  In many of the leases, the amount due and payable for storage of gas within the lease land (not in wells) is the delay rental payment.  As stated earlier with regard to severability, the provisions of consideration under the DTI leases, *i.e.,* delay rentals, royalties, and storage rentals, are not distinctly allocated to production and storage rights, but rather are written in such a way that payment for one purpose interrelates and impacts on the payments for the other.  This conclusion is consistent with the Court's earlier finding that the production and storage rights under the DTI the leases are not severable.

The Court does not find any of the cases cited by Plaintiffs on this issue persuasive.  *See*

_____

45.  Plaintiff also contends that the DTI leases do not preclude the application of the doctrine of implied covenant to develop and produce oil and gas because the leases are silent as to whether oil and gas must ever be produced where the properties are only being used for storage of gas. In reaching the conclusion that the production and storage rights under the DTI leases were not severable, this Court was able to ascertain the specific agreement of the parties from the leases vis a vis this very issue.  Thus, the Court does not find any merit to this argument.

*Brown v. Haight,* 255 A.2d 508, 509 (Pa. 1969); *Highfield Co. v. Kirk,* 93 A. 815 (Pa. 1915); *Clark v. Wright,* 166 A. 775 (Pa. 1933); *Appeal of Baird,* 6 A.2d 306 (Pa. 1939); *Aye v. Philadelphia Co.,* 44 A.555, 556 (Pa. 1899); *McKnight v. Mfgrs' Natural Gas Co.,* 23 A. 164, 165-66 (Pa. 1892).   The leases involved in those cases granted the lessees only production rights.  Therefore, the holdings in those cases are not dispositive of the issue before this Court.  With regard to the Kansas Supreme Court's decision in *Rook,* the Court finds that *Rook* is not binding authority and, in any event, is factually inapposite.  In that case, the Kansas Supreme Court was faced with the question of whether the production rights under two oil and gas leases had terminated where the leases remained in force and effect by an express provision in the habendum clause relative to gas storage rights, but all production activities had ceased.  The two leases in *Rook,* which were nearly identical, were valid and in effect at the time of the commencement of that litigation.  679 P.2d at 164.  The court found that the storage portion of the leases had been severed from the oil and gas production portion of the leases by assignment.[46]  *Id.*  Because the production and storage rights had been severed, the court ruled that the production rights could be terminated for abandonment of the leases or for failure to comply with the implied covenant of diligent and prudent operation, while the gas storage rights remained in force.[47]  *Id.* at 166.  Based on the existence of affirmative evidence of intentional and

---

46.  Unlike the case at bar, the leases in *Rook* contained an assignment provision, granting the lessee the right to assign any interests under the lease.  679 P.2d at 160-61.  The lessee in *Rook* exercised his rights under this provision and assigned both his storage rights and production rights to two different assignees, thus severing the storage rights from the production rights in the leases.  *Id.* at 161, 164.  Therefore, the *Rook* court concluded that a default in either the storage portion or production portion of the leases would not effect the other.  *Id.* at 164.

47.  In the actual document assigning the oil and gas interests in *Rook,* the assignee specifically agreed to operate the wells in a good, prudent and workmanlike manner to the fullest extent of their capacity; acknowledged the right to abandon wells which will not produce in paying quantities; and agreed to comply with all implied covenants.  *Id.* at 167.

voluntary relinquishment of the production rights, the Kansas Supreme Court in *Rook* held that the assignee had abandoned the oil and gas production rights under the leases. *Id.* at 166-67.

Clearly, the key to resolving the dispute in *Rook* was the fact that the production and storage rights in the leases had been severed by assignment. Here, by contrast, there is no assignment provision in any of the leases and, as explained above, the production and storage rights are not severable. Therefore, the holding in *Rook* is inapposite to the case at bar.

Given that the compensation paid under the DTI leases is not limited to royalties and is not specifically apportioned to either production or storage rights, but rather is applied to the lease agreement as a whole to extend the term of the lease indefinitely, payment of compensation under the alternative gas storage provisions of the DTI leases precludes the application of an implied covenant to develop and produce oil and gas under the Pennsylvania Supreme Court's decision in *Jacobs*. *See* Howard R. Williams & Charles J. Meyers, *5 Oil & Gas Law § 835.5* at 266.1 (2006) (discussing *Jacobs*, 772 A.2d 445). This conclusion is consistent with, if not mandated by, the Court's earlier finding that production and storage rights under the DTI leases are not severable. Thus, Plaintiffs argument that this Court should apply an implied covenant to develop and produce oil and gas despite the non-severability of the production and storage rights under the DTI leases is to no avail.[48]

--------------------------------------------------

48. Moreover, the DTI leases specifically state that the compensation received under the delay rental clause was adequate compensation for the right to drill or not drill. In most of the DTI leases, the amount of the storage rental fee is the same as the royalties or delay rentals due. Therefore, by implication, the storage rental fees received are also deemed adequate. Plaintiffs argue that the consideration of $ 1.00 was inadequate, and the delay rentals paid during the primary term expired long ago. Thus, Plaintiffs contend that they have not received adequate compensation for the production rights and they never agreed to allow the Defendants to hold such rights without actively extracting the oil and gas. Plaintiffs' argument fails as a matter of law because, as noted above, the production and storage rights are not severable, and therefore,

Accordingly, applying the Pennsylvania Supreme Court's holding in *Jacobs* to the facts here, the Court concludes that the specific agreement of the lessors and lessees under the DTI leases forecloses the application of an implied covenant to develop and produce oil and gas. Therefore, the Court holds that the DTI leases remain in force as to both production and storage rights.

### 4.    Abandonment

Under Pennsylvania law, to successfully establish a claim for abandonment, a party must show an intentional relinquishment of rights; a mere failure to exercise such rights, however, does not constitute abandonment. *Girolami v. Peoples Natural Gas Co.,* 76 A.2d 375, 378 (Pa. 1950) (citing *Aye, supra*; *Baglin v. Cusenier Co.,* 221 U.S. 580, 597-98 (1911); Merrill, *Abandonment of Oil and Gas Leases,* 11 Cornell L. Q. 499)) (absent the intent of the lessee to relinquish his rights under the lease, abandonment will not result, regardless of how remiss the lessee may have been in the performance of his obligations); *see also MacCurdy v. Lindey,* 37 A.2d 514, 516 (Pa. 1944) ("'Mere nonuse[ ] does not constitute abandonment; there must be an intention to abandon, together with 'external' acts by which such intention is carried into effect'") (quoting *United Nat. Gas. Co. v. James Bros. L. Co.,* 191 A. 12, 14 (Pa. 1937) (other citation omitted)); *Hummel v. McFadden,* 150 A.2d 856, 862 n.9 (Pa. 1959) (abandonment differs from a forfeiture in that the former is based on an intentional relinquishment of rights by lessee where the latter is based on a breach of an obligation) (citations omitted).

Abandonment has often been confused with breach of an implied covenant to develop and produce oil and gas. A true abandonment occurs when the lessee consciously intends to give up the

---

the compensation paid is not specifically allocable to one or the other. Moreover, as the DTI leases plainly show, that is exactly what the lessors agreed to when they signed the DTI leases.

lease and commits some positive act of abandonment; it is an intentional and voluntary relinquishment of rights. *Rook,* 679 P.2d at 165 (citing Merrill, *Covenants Implied in Oil and Gas Leases,* §§ 8, 9 (2d ed. 1940)); *Cassell v. Crothers,* 44 A. 446 (Pa. 1899). Where, however, a lessee permits a lease to terminate under its express terms by failing to either drill or pay delay rentals, that situation is properly characterize as a termination of the lease, not an abandonment.[49] *Id.* In addition, where there has been a breach of an implied covenant to develop and produce oil and gas, the courts will enforce an involuntary forfeiture of rights under the lease.[50] *Id.*; *see also Hummel,* 150 A.2d at 862 n. 9 (citation omitted); *Cassell, supra.*

Viewed in the light most favorable to Plaintiffs, the evidence of record here unequivocally demonstrates that Defendants have not intentionally relinquished their oil and gas production rights under the DTI leases. The record does not show any affirmative acts of abandonment. Unlike the lessee in *Jacobs,* there is no evidence here that DTI/DEPI or DTI's predecessors sold all of their production equipment. More importantly, *Jacobs,* upon which Plaintiffs rely, is distinguishable because Judge Cercone's determination regarding abandonment was predicated on his finding that an implied covenant to develop and produce oil and gas existed. In the case at bar, this Court finds no such implied covenant exists.[51]

---

49. As explained above, the DTI leases have not terminated under the express terms of the leases because Defendants have continuously stored gas and paid storage rental fees.

50. Since the Court has found an implied covenant to develop and produce oil and gas does not exist under the facts here, then there can be no breach and therefore no forfeiture of production rights under the DTI leases.

51. In addition, the cases relied upon by Judge Cercone in finding an abandonment of gas production rights are all distinguishable on their facts and, therefore, inapposite. *See Rook, supra*; *Clark v. Wright,* 166 A. 775, 778 (Pa. 1933) ("An unexplained cessation of operations under a lease the term of which depends on production, without renumeration to the lessor, for an unreasonable length of time, gives rise to a fair presumption of abandonment or surrender");

The evidence further demonstrates that in 2002, DTI entered into a "Farmout Agreement" with DEPI, and since that time DEPI has been actively drilling on properties (other than those subject to the DTI leases at issue here) in the Oakford and South Bend storage pools. In addition, prior to that time, in 1999, Defendants commissioned a geological study of the Oakford storage pool with the intent to explore, develop and produce gas.

In support of their claim that Defendants have abandoned their production rights under the DTI leases, Plaintiffs do not attempt to argue that the Pennsylvania Supreme Court's holding in *Girolami* and *MacCurdy* are not applicable here. Rather, Plaintiffs submit that DTI and its predecessors "have clearly 'abandoned' oil and gas production *operations* on the properties of the Landowner Plaintiffs." (Pls.' Reply Br. at 32.) (Emphasis added.) In support of this argument, Plaintiffs contend that Defendants, by admitting that (1) DTI's predecessors took affirmative steps to "convert" two natural gas production fields into storage fields, which became known as the South Bend and Oakford Storage Pools, and (2) that the predecessors' intent was to utilize these properties

---

*Cassell v. Crothers,* 44 A. 446 (Pa. 1899)(explaining the difference between abandonment, forfeiture, and termination, and finding lessee's production rights under the oil lease terminated because the lease expired by its terms); *Aye,* 44 A. at 556 (where parties to lease have failed to provide for a certain contingency in the lease, an implied obligation to explore and develop the land for oil existed, and failure to do so constituted an abandonment); *Cole v. Philadelphia Co.,* 26 A.2d 920, 923 (Pa. 1942) (lessee's disconnection of well from his pipelines for a brief interval while gas well was being drilled to a greater depth did not constitute a termination or abandonment of the lease); *Highfield Co. v. Kirk,* 93 A. 815, 816-17 (Pa. 1915) (drilling of one well over 16 years, coupled with declaration of lessees that they did not intend to further develop premises conclusively showed abandonment of property except for that necessary to operate the one well). With the exception of *Rook,* all of these cases involved single purpose leases involving the exclusive right to produce oil and gas. As explained above, *Rook* is inapposite because the Kansas Supreme Court's finding of abandonment was predicated on its determination that the gas production and storage rights had been severed by the exercise of an assignment provision in the leases. Thus, to the extent that Plaintiffs have relied on any of these cases in support of their claim of abandonment, such reliance is misplaced.

exclusively for gas storage, intentionally and effectively foreclosed their ability and intent to drill further production wells, due to the "economics" involved with drilling through storage formations and limited technology at the time.  (*Id.* at 33.)  Plaintiffs find Defendants' alleged basis for not drilling production wells on the properties of the Landowner Plaintiffs for over 40 years to be unreasonable, because Plaintiffs maintain that a large number of production wells were drilled in the storage fields during the past few decades.

Plaintiffs' argument completely misses the mark.  The conversion of the production wells and intent to utilize the properties exclusively for storage by DTI's predecessors does not provide evidence of an intent to relinquish oil and gas production *rights* under the DTI leases.  As explained above, the DTI leases were dual purpose leases which remain in effect as long as the Defendants are either producing *or* storing gas and paying the compensation due for such rights.  The actions of DTI's predecessors show only that they elected to exercise their gas storage rights; the Court cannot and will not presume an intent to abandon production rights where, as in this case, it has been determined that the production and storage rights are not severable, and no implied covenant to develop and produce oil and gas exists.  Moreover, the actions of DTI's predecessors in plugging the production wells in the storage fields and converting them to storage wells did not prevent DEPI from subsequently engaging in drilling and production activities in these storage fields.  As noted earlier, DEPI has drilled 25 production wells since 2002, and plans to drill 20 more in 2007, in the South Bend and Oakford Storage Pools.

Significantly, Plaintiffs argue that Defendants have clearly abandoned oil and gas production *operations* on the subject properties, not production *rights.*  The undisputed evidence shows that DTI's predecessors did indeed stop production *operations* for several decades beginning in the

40

1950s up until 1999.  However, such lack of activity does not rise to the level of an intentional relinquishment of rights, especially where, as in this case, an implied covenant to develop and produce oil and gas does not exist.

As to the reasonableness of Defendants' explanation for not drilling for almost 40 years, that simply is not material to determining whether there was an actual abandonment here of Defendants' production rights under the DTI leases.[52]  Thus, the Court finds no merit to Plaintiffs' argument in support of abandonment.

Aside from DTI/DEPI's lack of production on the properties subject to the DTI leases for approximately 40 years, Plaintiffs have failed to adduce any evidence of DTI/DEPI's intent to abandon their production rights.  As the Pennsylvania Supreme Court opined in *Girolami* and *MacCurdy,* mere nonuse is insufficient to establish intentional relinquishment of rights under the lease.  Moreover, a finding of abandonment is foreclosed by this Court's determination that the DTI leases are not severable as to production and storage rights and an implied covenant to develop and produce oil and gas simply does not exist here.  Accordingly, the Court finds that Plaintiffs have not established a claim of abandonment as a matter of law, and therefore, are not entitled to any relief on that basis.

---

52. The reasonableness of Defendants' actions, *i.e.,* the failure to engage in production activities for over 40 years, and their proffered explanation for such inaction, is not material to the outcome of the pending motions for partial summary judgment.  Rather, the reasonableness of Defendants' actions and/or explanation is material only to determining whether there was a *breach* of an implied covenant to develop and produce oil and gas.  Since this Court has determined that such an implied covenant does not exist here, the Court does not reach the question of whether a breach of that covenant occurred.  Therefore, the reasonableness of Defendants' actions and explanation is not material to resolving the motions for partial summary judgment.

5.      **Preclusive Effect of Judge Cercone's Opinion in** *Jacobs v.*
        *CNG Transmission Corp.* **(C.A. No. 99-319, W.D.Pa.)**

In federal *Jacobs,* Judge Cercone determined that CNG Transmission owed the landowner plaintiffs an implied covenant to develop and produce oil and gas on their property, and by failing to do so during the primary term of the lease, breached that covenant and thereby forfeited and/or abandoned its drilling and production rights under the lease to the subsurface except for the strata/horizons being used for storage of gas. Preliminarily, the Court notes that generally, it is not bound by a decision of another judge from the same district court. *Threadgill v. Armstrong World Indus., Inc.,* 928 F.2d 1366, 1371 (3d Cir. 1991) (doctrine of stare decisis does not compel one district court judge to follow the decision of another judge in the same district). An exception to this general rule exists, however, where the doctrine of collateral estoppel, or issue preclusion, applies to bar relitigation of the same issue. For the reasons set forth below, the Court finds that issue preclusion does not apply here and, in any event, federal *Jacobs* is distinguishable on its facts and not persuasive.

a.      **Issue Preclusion**

In support of their motion for partial summary judgment, Plaintiffs argue that summary judgment should be granted in their favor because the "Dominion companies" are barred by the doctrine of issue preclusion from relitigating the same issues that were decided by Judge Cercone in federal *Jacobs.* Even if issue preclusion does not apply, Plaintiffs argue Judge Cercone's decision in *Jacobs* is nevertheless extremely authoritative, instructive, and persuasive. Defendants strenuously disagree, arguing that these cases involve different issues of fact and law, different landowners, different leases and different properties.

42

The doctrine of issue preclusion, as well as the related doctrine of res judicata, serve important policy interests: "to minimize the judicial energy devoted to individual cases, establish certainty and respect for court judgments, and protect the party relying on the prior adjudication from vexatious litigation." *LeBeau v. LeBeau*, 258 Pa.Super. 519, 524, 393 A.2d 480, 482 (1978) (citing *James and Hazard, Civil Procedure, 523* (1977)).  In order for the doctrine of issue preclusion, or collateral estoppel, to apply, the party asserting it must demonstrate the existence of the following four elements:

> (1)    An issue decided in a prior action is identical to the one presented in a later action;
>
> (2)    The prior action resulted in a final judgment on the merits;
>
> (3)    The party against whom collateral estoppel is asserted was a party to the prior action, or is in privity with a party to the prior action; and
>
> (4)    The party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action.

*Columbia Med. Group, Inc. v. Herring & Roll, P.C.,* 829 A.2d 1184, 1190 (Pa. Super. 2003) (quoting *Rue v. K-Mart Corp.,* 713 A.2d 82, 84 (Pa. 1998)).  Some courts cite a fifth element: "the determination in the prior proceeding was essential to the judgment."  *R.W. v. Manzek,* 888 A.2d 740, 748 (Pa. 2005).  For purposes of issue preclusion, "a final judgment includes any prior adjudication of an issue in another action that is sufficiently firm to be accorded conclusive effect." *Commw. of Pa. v. Holder,* 805 A.2d 499, 503 (Pa. 2002) (citing *Restatement (Second) of Judgments, § 13* cmt. g).

The Pennsylvania courts have recognized a number of equitable considerations that will prevent the application of issue preclusion, including where "'the amount in controversy in the first

action may have been so small in relation to the amount in controversy in the second that preclusion would plainly be unfair.'" *Rue,* 713 A.2d at 86 (quoting *Restatement (Second) of Judgments, § 28,* cmt. j) (other citations omitted).  In this instance, a court may determine that party against whom issue preclusion is asserted did not have  a full and fair opportunity to litigate the issue.

In this case, Plaintiffs are asserting collateral estoppel offensively.   As the Pennsylvania Superior Court explained in *Toy v. Metropolitan Life Ins. Co.*:

> "Collateral estoppel is used offensively when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action against another party. A plea of collateral estoppel is valid if, 1) the issue decided in the prior adjudication was identical with the one presented in the later action, 2) there was a final judgment on the merits, 3) the party against whom the plea is asserted was a party in privity or in privity with a party to the prior adjudication, 4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action." *Shaffer v. Smith*, 543 Pa. 526, 529, 673 A.2d 872, 874 (1996) (internal quotations and citations omitted). Additionally, when a plaintiff seeks to employ the doctrine offensively, courts must also consider whether (1) plaintiff had an opportunity to join the earlier action, (2) the defendant had an incentive to defend the first action vigorously, (3) the judgment relied upon as a basis for collateral estoppel is inconsistent with one or more previous judgments in favor of the defendant, and (4) the second action would afford the defendant procedural opportunities unavailable in the first action that could produce a different result. *See Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 329-331, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). In considering whether the application of the doctrine of offensive collateral estoppel is warranted, "the general rule should be that in cases where a plaintiff could easily have joined the earlier action or where, either for the [aforementioned] reasons ... or for other reasons, the application of offensive collateral estoppel would be unfair to a defendant, a trial judge should not allow the use of collateral estoppel." *Id.* at 331, 99 S.Ct. 645.

863 A.2d 1, 15 (Pa. Super. 2004).  Offensive collateral estoppel is subjected to these additional

requirements because offensive use of the doctrine does not promote judicial efficiency in the same manner as collateral estoppel asserted in a defensive posture. *Commw., Dep't of Transp. v. Martinelli*, 563 A.2d 973, 977 (Pa. Commw. Ct. 1989)(citing *Parklane Hosiery, supra*)) (footnote omitted). The party asserting offensive collateral estoppel bears the burden of establishing its applicability. *Toy,* 863 A.2d at 16.

Although mutuality of parties is not a requirement to invoking offensive collateral estoppel, the Pennsylvania Supreme Court noted a possible exception to this rule where necessary to accomplish substantial justice, such as in the case where successive litigation of identical issues by several plaintiffs is likely. *Estate of Ellis, III*, 333 A.2d 728, 731 & n. 7 (Pa. 1975). In that instance, the Pennsylvania Supreme Court noted that "if mutuality were completely abandoned a common defendant might successfully defend several actions, lose one and be subjected to a plea of collateral estoppel for the remaining cases." *Id.* at 731 n. 7 (citing B. Currie, *Mutuality of Collateral Estoppel: Limits of the Bernhard Doctrine,* 9 Stanford L. Rev. 281, 308 *et seq.* (1957)).

In the present litigation, Defendants attempt to show dissimilarity by arguing that the controversy between the parties involves different property, different leases, different landowners, and different actions by Penneco to interfere with those leases, but for the most part, that is a distinction without a difference. The provisions at issue in the DTI leases here are very similar to the lease provisions at issue in *Jacobs*, with the exception of those DTI leases which did not contain a primary term. In addition, the legal issue presently before this Court is the same as that decided in *Jacobs*. Defendants also contend that Judge Cercone based his decision in *Jacobs* on his determination of the intent of the landowners and because that would entail an individual assessment of each landowner, the intent of the parties in *Jacobs* cannot be preclusive as to the parties in this

litigation.  However, the fact that Judge Cercone in *Jacobs* based his decision on his determination of the intent of the parties to that lease considering all of the circumstances, does not distinguish *Jacobs* from this case for purposes of issue preclusion.  In applying the standard for issue preclusion, this Court is not required to consider the previous court's analysis of the issue, but rather, must look at whether the issue in the prior litigation is identical to the one currently before it.

More importantly, however, the Court finds that offensive collateral estoppel should not be applied here because it is clear that preclusion would be unfair to Defendants under the facts of this case.  DTI's predecessor in *Jacobs,* CNG Transmission, entered into settlement negotiations with the landowner-plaintiffs, Mr. and Mrs. Jacobs, and Penneco Energy Corporation, shortly after Judge Cercone issued his decision granting partial summary judgment in favor of plaintiffs.  A final judgment was never entered in that case, and CNG Transmission did not appeal the grant of summary judgment, due to the settlement of the case.  *Jacobs* involved one property, two landowners (husband and wife), and one lease agreement.  By contrast here, there are over 100 landowners, 48 leases, and as many properties.  The sheer number of parties, leases and properties involved is so much greater compared to that involved in *Jacobs* that applying issue preclusion here would be patently unfair.  In addition, there is a substantial likelihood, given the relative smallness of the *Jacobs* action, CNG Transmission did not have an incentive to defend the first action vigorously.  Indeed, CNG Transmission settled with the plaintiffs, thereby foregoing an appeal of Judge Cercone's opinion.  CNG Transmission believed federal *Jacobs* was wrongly decided and would likely not have settled and foregone an appeal if it knew that Penneco would turn around and use Judge Cercone's opinion against it in subsequent litigation involving substantially more landowners, properties and leases.  Under these circumstances, this Court concludes that DTI and/or

46

its predecessor, CNG Transmission, did not have a full and fair opportunity to litigate the issue of the existence of an implied covenant to develop and produce oil and gas in *Jacobs*.[53]  Accordingly, following the guidance of the Supreme Court in *Parklane Hosiery,* this Court declines to apply offensive collateral estoppel in the present litigation.[54]

**b.     Federal *Jacobs* is Not Persuasive and is
        Factually Distinguishable**

Plaintiffs argue, in the alternative, that should this Court decline to apply issue preclusion, that Judge Cercone's decision in *Jacobs* is still "extremely authoritative, instructive and persuasive." (Pls.' Br. at 32-33.)   There is no doubt that Judge Cercone's opinion thoroughly examines Pennsylvania law regard oil and gas leases since the 1900s.  However, this Court does not find Judge Cercone's decision as to whether an implied covenant to develop and produce oil and gas existed, or as to whether Defendants abandoned their production rights under the DTI leases, persuasive. First, the cases relied on by Judge Cercone with regard to the issue of an implied covenant to

---

53.  Plaintiffs actions when they instituted these lawsuits further support this conclusion.  On the civil cover sheet, Plaintiffs did not check the box for related cases. Only after the District Judge originally assigned to these cases entered an order of recusal, nearly two years after this litigation was initiated, did Plaintiffs file a motion to have these two cases reassigned to Judge Cercone, then contending that this litigation is related to *Jacobs v. CNG Transmission Corp.,* Civ. A. 96-319.  Defendants filed an opposition to this motion and Judge Ambrose denied the motion.  (Doc. Nos. 150, 152 & 156 in C.A.05-49; Doc. Nos. 88, 90 & 94 in C.A. 05-537.)

54.  Plaintiffs raise for the first time in their Reply Brief a meritless argument that this Court should employ the doctrine of judicial estoppel to "prevent[ ] DTI from 'playing fast and loose' with the judicial system by adopting *whatever position suits the moment*."  Pls.' Reply Br. at 37. Plaintiffs fail to point out any inconsistent positions taken by Defendants in *Jacobs* and these cases, nor does the Court find any, and therefore, application of judicial estoppel is clearly unwarranted here.  *Mintze v. Am. Gen. Financial Servs., Inc.,* 434 F.3d 222, 232 (3d Cir. 2006) (citing *New Hampshire v. Maine,* 532 U.S. 742, 749 (2001))..

develop and produce oil and gas involved "production only" leases.  Second, this Court is unable to reconcile Judge Cercone's finding that production and storage rights under the lease agreement were not severable with his conclusion that continued use of the property for gas storage did not extend the lease term as to production rights beyond the primary term.[55]  In so holding, Judge Cercone found the parties did not expressly agree in the lease agreement as to whether production rights would remain in force if the only compensation was for storage rentals.  Therefore, Judge Cercone found an ambiguity existed and looked to the intent of the parties, including extrinsic evidence, to determine whether an implied covenant to develop and produce oil and gas existed.  Here, the Court found no such ambiguity in the DTI leases, having determined that the parties specifically agreed that payment of one of the different types of compensation would work to extend the term of the lease as to both production and storage rights, and construed the leases as written.[56]

As to Judge Cercone's finding of abandonment, that too is distinguishable for the reasons set forth above.  *See* discussion, *supra,* Part II.C.4., at 39 and note 51.

Accordingly, the Court finds Judge Cercone's opinion in *Jacobs* neither persuasive nor dispositive as to the issues of whether an implied covenant to develop and produce oil and gas exists in this litigation, and as to whether Defendants abandoned their production rights under the DTI

---

55.  *See* Howard R. Williams & Charles J. Meyers, *5 Oil & Gas Law § 835.5* at 266.2.

56.  A further factual distinction between *Jacobs* and this litigation is that the landowners in *Jacobs* provided notice and an opportunity to cure to CNG Transmission, prior to instituting that lawsuit.  No such notice and opportunity to cure was provided here.  However, because this Court has found an implied covenant to develop and produce oil and gas does not exist, this distinction is not dispositive of the outcome of this case.

48

leases.

**6.      Affirmative Defenses of Statute of Limitations, Laches
and Failure to Provide Notice and Opportunity to Cure**

In light of the Court's conclusion that Defendants have not forfeited their production rights under the DTI leases, the Court recommends that Defendants' motions for partial summary judgment be granted.  Therefore, the Court need not address the affirmative defenses raised alternatively by Defendants.

## III.   <u>CONCLUSION</u>

Although the Court is not unsympathetic to Plaintiffs' plight and the seemingly inequitable result reached here, it nonetheless is required to apply controlling law which,  in light of the plain and unambiguous language of the DTI leases, requires the Court to construe the leases as written, resulting in a finding in favor of Defendants.  Therefore, for this reason and the reasons set forth above, it is recommended that Defendants' Motions for Partial Summary Judgment be granted.  It is further recommended that Plaintiffs' Motion for Partial Summary Judgment be denied.

In accordance with the Magistrates Act, 28 U.S.C.  § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation.  Any party opposing the objections shall have ten (10) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Dated:  May 21, 2007                              By the Court:

                                                   LISA PUPO LENIHAN

United States Magistrate Judge

cc:    Honorable Donetta W. Ambrose
       Chief United States District Judge

       All Counsel of Record
       *Via Electronic Mail*